**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DINO JOSEPH FERRANTE, | CASE NO. 1:15-cv-00553-SHR-GBC |
| Plaintiff, | (JUDGE RAMBO) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 9, 10, 13, 14, 15 |

**REPORT AND RECOMMENDATION**

## I.    Procedural Background

On February 6, 2013 and February 25, 2014, Dino Joseph Ferrante ("Plaintiff") respectively filed as a claimant for disability insurance benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a date last insured of December 31, 2013,[1] and claimed an amended disability onset date of October 31, 2008.  (Administrative Transcript (hereinafter, "Tr."), 9). After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on April, 23, 2014.  (Tr. 53-100). On May 28, 2014, the ALJ found that Plaintiff was not disabled within the

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

meaning of the Act.  (Tr. 6-26).  On June 28, 2014, Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on January 30, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-5).

On March 19, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration ("SSA") denying social security benefits.  (Doc. 1).  On May 20, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 9, 10).  On June 10, 2015, Plaintiff filed a brief in support of the appeal.  (Doc. 13 ("Pl. Brief")).  On June 29, 2015, the Court referred this case to the undersigned Magistrate Judge.  On July 8, 2015, Defendant filed a brief in response.  (Doc. 14 ("Def. Brief")).  On July 15, 2015, Plaintiff filed a reply brief.  (Tr. 15 ("Reply")).

## II.    Relevant Facts in the Record

### A. Education, Age, and Vocational History

The relevant period begins on October 31, 2008, Plaintiff's alleged onset date, and ends on May 28, 2014, the date of the ALJ's decision.  Plaintiff was born in May 1962, and thus was classified by the regulations as a person closely approaching advanced age as of the date of the ALJ's decision.  20 C.F.R. § 404.1563(d); (Tr. 57).  Plaintiff graduated high school and completed two years of

college without earning a degree.  (Tr. 58).  From 1986 to 2006 Plaintiff worked as

an operations clerk in the stock exchange and from 2006 to 2008 he worked as a

customer service representative for an investment company.  (Tr. 207).

### B.  Relevant Treatment History and Medical Opinions

**1.  Lehigh Valley Hospital - Cedar Crest, dated 11/01/2008 to 256-307 52 11/07/2008: Uzma Z. Vaince, M.D.; Howard Rosenberg, M.D.; Elliot Shoemaker, M.D.; James Ross, M.D.; Wayne E. Dubov, M.D.**

From November 1, 2008, to November 7, 2008, Plaintiff was hospitalized.

(Tr. 258-307).  Upon admission Plaintiff reported that he was diagnosed with gout

five or six years prior and at that time he had seen an orthopedist who aspirated his

knee, and fluid analysis was consistent with acute gout.  (Tr. 305)  Plaintiff

reported that since the gout diagnosis, he has had approximately two gout flare-ups

yearly involving feet, ankles or knees and colchicine for one to two days

completely resolved the symptoms.  (Tr. 305).  On November 1, 2001, Dr. Ross

examined Plaintiff and observed bilateral effusions of the knees with warmth, that

the right knee was larger than the left knee, there was "slight pain with range of

motion of the knees," tenderness and tenderness and swelling in the ankles and

feet. (Tr. 305).

Dr. Dubov noted that Plaintiff's gait dysfunction was due to the lower

extremity pain likely due to his gout and a rheumatology consult would be

recommended if the "gout symptoms or his right lower extremity symptoms do not

improve since, at this point, this has a major functional limitation." (Tr. 302-03). Treatment records indicated that Plaintiff last worked in 2006, was laid off and rehired and was recently unemployed and collected unemployment benefits. (Tr. 261, 268, 301). Records also not that Plaintiff engaged in daily alcohol abuse of at least two glasses of vodka, and was uninsured at the time of the hospitalization. (Tr. 261, 268, 305). A report noted that upon discharge, Plaintiff was diagnosed with: 1) acute intracerebral hemorrhage; 2) malignant hypertension; 3) gouty arthritis; 4) ETOH abuse; and 5) acute kidney injury. (Tr. 258). On November 1, 2008, Plaintiff presented to the Poconos Hospital with a sudden onset of the right-sided headache and left facial droop accompanied by left-sided weakness. (Tr. 258). On arrival, his blood pressure was 209/126 and a CT of the head showed a right intercerebral hemorrhage. (Tr. 258). Plaintiff's past medical history included gastric bypass surgery in 2002, uncontrolled hypertension, ETOH abuse, and a history of cocaine abuse. (Tr. 268, 294). During the physical therapist consult, it was observed that Plaintiff was alert and oriented x3 and was able to follow two step commands 100 percent of the time. (Tr. 296).

Plaintiff underwent an ultrasound which showed normal sonography of the kidney (Tr. 288), the echocardiogram done showed mild diastolic dysfunction, the initial left-sided weakness subsequently improved, and his blood pressure decreased to 140/95. (Tr. 259). Plaintiff also experienced a flare-up of gout

involving the right ankle and the left knee.  (Tr. 259).

An examination prior to discharge revealed that Plaintiff had motor power 4-5/5 in the left upper and lower extremities, slight swelling in the left ankle, and in the right ankle and left knee.  (Tr. 259).  At the time of discharge, Plaintiff was "hemodynamically stable.  He denied any chest pain, palpitations, did complain of slight swelling in the left ankle."  (Tr. 259).  No restrictions were placed and the report indicated that Plaintiff could resume normal activity (Tr. 262), and had "modified" independence for locomotion and transfer mobility.  (Tr. 266).

### 2. Pocono Medical Center: Christopher Pomrink, D.O.; Gervaise Charles, M.D.; Olutunde Odeyemi, M.D.

On June 20, 2009, Plaintiff sought emergency treatment for severe swelling of his legs and pain in the right foot and toes that made it difficult for him to walk. (Tr. 313).  Plaintiff was hospitalized from June 20, 2009, to June 24, 2009, and was discharged with the diagnoses of: 1) bilateral lower extremity swelling, secondary to arthralgias and possible rheumatologic disease, no evidence of congestive heart failure ("CHF"); 2) microcystic anemia; 3) symptomatic anemia; 4) iron deficiency; 5) uncontrolled hypertension; 6) rheumatologic disorder; 7) Possible rheumatoid arthritis; 8) chronic kidney disease; 9) chronic renal insufficiency; and 10) uncontrolled hypertension.   (Tr. 310).   Plaintiff "adamantly refused" the recommended upper and lower GI endoscopy and it was noted that Plaintiff was not compliant with his vitamin supplements after his gastric bypass in 2002.  (Tr.

311).  Dr. Pomrink noted that "[i]t was thought that his renal failure at least in part based on the hypertension, however there may be underlying rheumatologic disorder."  (Tr. 311).  Dr. Pomrink asked Plaintiff to follow-up with rheumatology on an outpatient basis.  (Tr. 311).  Dr. Pomrink noted that Plaintiff had an orthopedic consultation where Dr. Barnes performed joint aspiration and found no signs of gout or infection.  (Tr. 311).  Plaintiff condition at discharge was described as "stable," "ambulating much better," and Plaintiff reported significant symptomatic improvement.  (Tr. 312).

On January 24, 2011, Plaintiff sought emergency treatment for shortness of breath, was hospitalized and discharged on January 27, 2011.  (Tr. 318).  Upon admission, Plaintiff had a blood pressure of 225/153 and it "was felt to have acute pulmonary edema and chronic kidney disease stage III to IV, and also macrocytic anemia."  (Tr. 318).  Plaintiff reported drinking alcohol socially and that he had not been taking any medication for several months because he lost his medical coverage when he lost his job.  (Tr. 314).  Upon examination Dr. Odeyemi noted that Plaintiff was in "mild respiratory distress," that his extremities revealed "bipedal edema, pitting, 2+," and that did not have any blurred vision or vision changes.  (Tr. 321). Dr. Charles noted that a bilateral renal ultrasound revealed "nodular necrosis," informed Plaintiff that he had chronic kidney disease and that he needed to follow up with the renal department, but Plaintiff refused.  (Tr. 318-

19).  Plaintiff "claimed that he would probably followup with [renal experts] as an outpatient" and it was noted that Plaintiff has insurance and stated that he would will follow up for further evaluation of his kidney disease.   (Tr. 319).   His discharged diagnosis included chronic end-stage kidney disease stage III to IV. (Tr. 319).

On March 5, 2011, Plaintiff sought treatment for his hypertension, and requested a refill of his medication which he had ran out of for the past four days and he could not be seen by his primary care provider until the next appointment in a month.   (Tr. 324).   His blood pressure was 225/121 but was "otherwise asymptomatic."  (Tr. 324-25).   It was observed that Plaintiff was ambulatory and had a steady gait and he had no history of falling, and no ambulatory aid.  (Tr. 325-326).   Plaintiff's eyes were examined and it was nothing abnormal was noted.  (Tr. 326).

### 3.  PMC Physician Associates- Cardiology: Karthik P. Sheka, M.D.

On May 25, 2012, Plaintiff sought follow-up treatment for his hypertension management and management of his heart failure.   (Tr. 333).   Plaintiff's blood pressure was 156/94, examination revealed no gross motor deficits, musculoskeletal examination was normal.  (Tr. 333).   Dr. Sheka opined that Plaintiff's hypertension was "only marginally controlled," changed his medications and referred him to a nephrologist because Dr. Sheka was worried that Plaintiff

was "heading towards dialysis." (Tr. 333).

On June 22, 2012, Plaintiff sought follow-up treatment for improved hypertension management and for congestive heart failure due to diastolic dysfunction, associated chronic kidney disease and hypertension. (Tr. 331-32). Plaintiff reported doing generally well and denied dyspnea on exertion or leg edema. (Tr. 331). His blood pressure was 150/84, examination revealed no gross motor deficits, musculoskeletal examination was normal. (Tr. 331). Dr. Sheka opined that Plaintiff's hypertension was "somewhat better controlled, and better at home" and that no changes in his medications were needed. (Tr. 331).

On May 7, 2013, Plaintiff sought follow-up treatment and refilling of his medication. (Tr. 358). His blood pressure was 150/104, BMI was 36.94, examination revealed no gross motor deficits, and the musculoskeletal examination was normal. (Tr. 358). Dr. Sheka noted that Plaintiff's blood pressure "is apparently better controlled at home than it is here" and strongly advised him to see a nephrologist to follow his chronic kidney disease. (Tr. 358).

### 4.  Pocono Medical Group: Solibe Ufondu, M.D.

On April 5, 2011, Plaintiff initiated care with the physician to address his hypertension. (Tr. 351). Plaintiff's BMI was 40.90, blood pressure was 201/101, and extremities revealed no edema. (Tr. 349). Plaintiff reported that he ran out of his medication and was advised to resume his medication immediately. (Tr. 349).

On April 19, 2011, Plaintiff sought follow-up treatment for his hypertension and reported that he felt better.  (Tr. 349-50).  Plaintiff's BMI was 40.74, blood pressure was 139/75, and extremities revealed no edema.  (Tr. 349).  Plaintiff was advised to get his blood work done.  (Tr. 349).  On June 20, 2011, Plaintiff sought follow-up treatment for his hypertension and reported experiencing joint pain.  (Tr. 347-48).  Plaintiff's BMI was 42.57, blood pressure was 149/79, and extremities revealed no edema.  (Tr. 347).  Plaintiff was strongly advised to get his blood work done and to return in three weeks.  (Tr. 347-48).

On April 27, 2012, Plaintiff sought follow-up treatment for his hypertension and refill of his medications.  (Tr. 345-46).  Plaintiff reported not taking his medication as instructed.  (Tr. 345).  Plaintiff's BMI was 41.42, blood pressure was 171/101, and extremities revealed no edema.  (Tr. 345).  Plaintiff was advised to resume his medication.  (Tr. 345).  On May 11, 2012, Plaintiff sought follow-up treatment for his hypertension.  (Tr. 343-44).  Plaintiff's BMI was 41.42, blood pressure was 160/81, and extremities revealed no edema.  (Tr. 343).  On June 8, 2012, Plaintiff sought follow-up treatment for his hypertension.  (Tr. 341-42).  Plaintiff's BMI was 41.35, blood pressure was 133/81, and extremities revealed no edema.  (Tr. 341).  On August 10, 2012, Plaintiff sought follow-up treatment for his hypertension and for medication refill.  (Tr. 339).  His blood pressure was 117/80 and extremities revealed no edema, but Plaintiff reported knee pain for the

past two weeks.  (Tr. 339).  On November 30, 2012, Plaintiff sought follow-up treatment for his hypertension and it was noted that he has been noncompliant with his medication.  (Tr. 353-54).  Plaintiff's BMI was 40.41, blood pressure was 172/92, and extremities revealed no edema, however, Plaintiff reported experiencing knee pains.  (Tr. 353).  Plaintiff was to follow-up in six weeks.  (Tr. 354).

On March 13, 2013, Plaintiff sought follow-up treatment for his hypertension and requested refilling of his medication.  (Tr. 433-34).  Plaintiff denied experiencing blurry vision, his BMI was 38.92, blood pressure was 140/80, and extremities revealed no edema, however, Plaintiff reported experiencing knee pain.  (Tr. 433).  It was recommended for his next follow-up appointment to be in two months.  (Tr. 434).

On May 15, 2013, Plaintiff sought follow-up treatment for his hypertension.  (Tr. 393-94).  Plaintiff denied experiencing blurry vision, his BMI was 38.01, blood pressure was 140/80, and extremities revealed no edema, however, Plaintiff reported experiencing knee pain.  (Tr. 393).  It was recommended for his next follow-up appointment to be in three months.  (Tr. 394).  On July 17, 2013, Plaintiff sought follow-up treatment for his hypertension.  (Tr. 391-92).  Plaintiff denied experiencing blurry vision, his BMI was 37.86, blood pressure was 120/80, and extremities revealed no edema, however, Plaintiff reported experiencing knee

pain.  (Tr. 391-92).  It was recommended for his next follow-up appointment to be in four months.  (Tr. 392).

### 5.  Consultative Examination Report: Thomas W. McLaughlin, M.D.

On May 14, 2013, Plaintiff was evaluated by Dr. McLaughlin for alleged cerebrovascular accident ("CVA"), congestive heart failure, rheumatoid arthritis, hypertension, and chronic kidney disease.  (Tr. 367).  Dr. McLaughlin stated that he reviewed records from Pocono Medical Center and from his family doctor.  (Tr. 371).

Plaintiff reported that he suffered a CVA in October 2008 and although he had no leg weakness, he did have right eye problem since the CVA with degreed vision of the right eye.  (Tr. 367).  Plaintiff reported that after a week of hospitalization his left arm paralysis markedly improved and currently experienced mild weakness in the left arm.  (Tr. 367).  Plaintiff reported experiencing diffuse arthralgia involving the legs, the knees, the toes, and the back most affecting the knees.  (Tr. 368).  Dr. McLaughlin noted that Plaintiff reported that he had "been given the diagnosis of rheumatoid arthritis but [was] on no specific antirheumatoid medications."  (Tr. 368).  Dr. McLaughlin also noted that Plaintiff needed a cane to walk and "[could not] go without the cane."  (Tr. 368).  Plaintiff reported that during the flare-ups of his arthritic symptoms, he has severe pain, swelling and stiffness such that it he is unable to get out of the bed.  (Tr. 368).

Plaintiff described the flare-up paint as ten out of ten sharp pain which worsened with movement and cold and rainy weather, and is unrelated to the time of day. (Tr. 368). Plaintiff reported never having arthrocentesis or intraarticular injections, and his knees do not lock up or give way. (Tr. 368). Plaintiff reported a history of congestive cardiomyopathy and subsequently taking medication as a result. (Tr. 368). Plaintiff reported dyspnea on exertion of one flight of stairs or one half block, however, his exercise tolerance is markedly affected by his joint pain. (Tr. 368). Plaintiff reported experiencing paroxysmal nocturnal dyspnea about once per week and that he has no peripheral edema while he is on diarrheic and no exertional chest pain. (Tr. 368). Plaintiff reported that he also has a history of chronic kidney disease and is a candidate for dialysis according to his nephrologist. (Tr. 368). Plaintiff reported that he uses alcohol occasionally and lives by himself. (Tr. 369). Plaintiff reported that he last worked in 2008 at the New York Stock Exchange. (Tr. 369).

Upon examination Dr. McLaughlin observed that Plaintiff had a "markedly antalgic gait using a cane which he cannot go without." Dr. McLaughlin observed that Plaintiff:

> could not lie down for the examination due to the diffuse pain and the examination was conducted standing up. He needed the assistance of the cane to rise from the seated position. He was unable to step up and down from the examination table. He was not able to assume the supine position. [Plaintiff was] able to understand normal spoken speech and follow instructions and has a good knowledge of recent

and remote medical history.

(Tr. 369).  Plaintiff's BMI was 39, initial blood pressure was 182/114, repeat blood

pressure was 180/110, and final blood pressure was 180/110.  (Tr. 369).

Dr. McLaughlin noted that:

> [u]ndilated funduscopic examination reveals there are hypertensive
> changes with hemorrhages and exudates on the right eye. The left eye
> showed AV crossing changes. Visual acuity is 20/200 in the right eye
> and 20/25 in the left eye, without corrective lenses. Visual fields are
> normal by confrontation.

(Tr. 369).

> Upon examination of the extremities, Dr. McLaughlin observed that there

was:

> no evidence of pedal edema, clubbing, cyanosis or calf tenderness.
> Homans sign is negative bilaterally. There is no evidence of
> peripheral vascular insufficiency or chronic venous stasis changes. . . .
> Peripheral pulses [were] normal. Femoral could not be palpated as the
> examination was done in the seated position. There are no arterial
> bruits noted. Straight leg raising could not be determined. Sitting root
> test [was] negative bilaterally.

(Tr. 369).

Dr. McLaughlin also observed that the shoulders, elbows, hands and wrists

were non-tender, and without any redness, swelling or warmth.  (Tr. 370-71).

Plaintiff was able to make a fist bilaterally, open a jar, open a door, pick up coins,

write, and use the hands to button and unbutton without problem.  (Tr. 371).  Dr.

McLaughlin noted that Plaintiff's "grip strength measures 30 kg of force on the

right and 14 kg of force on the left."  (Tr. 371).  Dr. McLaughlin also observed

that:

> Examination of the knees reveals no tenderness, redness, warmth, swelling, effusion, laxity, crepitus, or clicks. . . . Examination of the hips reveal no tenderness to palpation. . . . Examination of the dorsolumbar spine reveals normal curvature. There is no evidence of paravertebral muscle spasm. Percussion of the spinous processes is not associated with tenderness. [Plaintiff] is not able to stand on one leg at a time. The right leg measures 45 cm at mid calf and 56 cm at mid thigh. The left leg measures 45 cm at mid calf and 56 cm at mid thigh. The right arm measures 30 cm at mid biceps and 29 cm at mid forearm. The left arm measures 30 cm at mid biceps and 29 cm at mid forearm. There is no evidence of muscle weakness or atrophy noted.

(Tr. 371).  Dr. McLaughlin noted that Plaintiff "was awake, alert and oriented to time, place, and person and was able to engage in appropriate conversation, answer questions appropriately and follow directions.  (Tr. 371).  Dr. McLaughlin noted that Plaintiff was not able to walk on the heels, not able to walk on the toes, not able to walk heel-to-toe and he could not squat.  (Tr. 371).  Plaintiff had 4/5 strength in the left upper extremity and 5/5 strength throughout.  (Tr. 371).  Deep tendon reflexes were normal.  (Tr. 371).

Dr. McLaughlin opined that Plaintiff had: 1) status-post right CVA with residual left arm weakness and decreased vision in the right eye; 2. rheumatoid arthritis with multiple joint involvement; 3) hypertension; 4) hypertensive and congestive cardiomyopathy; 5) chronic kidney disease; 6) obesity; 7) hyperlipidemia; and, 8) decreased vision in the right eye.  (Tr. 372).

Dr. McLaughlin attached a Range of Motion form and a Medical Source Statement form.   (Tr. 374-81).  Dr. McLaughlin noted that Plaintiff had; 1) full range of motion for his shoulders, elbows, ankles, and wrists, bilaterally; 2) a right knee flexion and extension from ten to ninety degrees and a left knee flexion and extension from zero to ninety degrees out of a full range of zero to 150 degrees; 3) for the lumbar region, flexion-extension to sixty degrees out of ninety, and a right and left lateral flexion of ten out of twenty; 4) for the cervical region, full lateral flexion, general flexion and extension of twenty degrees out of thirty degrees, and a right and left rotation for forty degrees out of forty-five degrees; 5) and Dr. McLaughlin could not measure the range of motion for the hips.  (Tr. 380-81).

McLaughlin opined that Plaintiff could occasionally lift and carry up to ten pounds and never lift or carry anything eleven pounds or greater.  (Tr. 374).  Dr. McLaughlin opined that Plaintiff could sit for two hours, stand for one hour and walk for thirty minutes at a given time and opined that Plaintiff could sit six hours, stand four hours, and walk one hour in a work day.  (Tr. 375).  Dr. McLaughlin opined that it was medically necessary for Plaintiff to use a cane to ambulate, could not ambulate any distance without a cane, and could not use his free hand to carry small objects without a cane.  (Tr. 375).

Dr. McLaughlin noted that Plaintiff was left-hand dominant and opined that Plaintiff could frequently reach overhead, reach in general, handle, finger, and feel

with his right hand, and occasionally push and pull with his right hand.  (Tr. 376).

According to Dr. McLaughlin, Plaintiff could occasionally reach in all directions,

handle, finger, feel, push, and pull.   (Tr. 376).   Dr. McLaughlin opined that

Plaintiff could occasionally operate foot controls with his right and left feet.  (Tr.

376).  Dr. McLaughlin also opined that Plaintiff could never climb stairs, ramps,

ladders, and scaffolds, and could never balance, stoop, kneel, crouch, or crawl.

(Tr. 377).  Dr. McLaughlin opined that Plaintiff had a visual impairment which

made him unable to read very small print, and could not determine the differences

in shape and color of small objects such as screws, nuts, and bolts.  (Tr. 377).

However, Plaintiff was still able to avoid ordinary workplace hazards and

obstacles, could read ordinary newspaper print, and could view a computer screen.

(Tr. 377).

Dr. McLaughlin opined that Plaintiff could: 1) never be exposed to

unprotected heights, humidity, or extreme cold; 2) occasionally be around moving

mechanical parts, operate a moving vehicle, be exposed to extreme heat, or

vibrations; and, 3) frequently be exposed to dust, odors, and pulmonary irritants.

(Tr. 378).   Dr. McLaughlin wrote that Plaintiff could: 1) shop; 2) travel

independently; 3) ambulate without using a wheelchair, walker, two canes or two

crutches; 4) could prepare simple meals and feed himself; 5) care for his personal

hygiene; and, 6) sort, handle, and use paper.  (Tr. 379).  Dr. McLaughlin opined

that the above-described limitations have lasted or would last for twelve months consecutively. (Tr. 379).

### 6. Alex Siegel, Ph D.

On May 30, 2013, Dr. Siegel opined:

[Plaintiff] alleges memory loss on the 3368. In the 3373, [Plaintiff] reported difficulty with concentration and attention. At a recent physical CE, Dr. McLaughlin reported [Plaintiff's] cognitive functioning and affect was intact [Plaintiff's] PCP does not indicate any cognitive difficulties for the claimant. There is no evidence of any psychiatric diagnosis or treatment in the record.

(Tr. 108).

### 7. S. Latchamsetty, M.D.

On July 2, 2013, Dr. Latchamsetty noted that Plaintiff's past relevant work from June 1986 to June 2006 was DOT Title "Margin Clerk I" with code 216.362-042 and customer service representative from June 2006 to October 2008. (Tr. 112). Based on the June 4, 2013 RFC assessment by Dr. Smith, Dr. Latchamsetty opined that Plaintiff had an RFC to perform his past relevant work as generally performed in the national economy. (Tr. 112). Dr. Latchamsetty determined that Plaintiff was not disabled and that there was no evidence of any substance abuse disorder or DAA issue. (Tr. 112). Dr. Latchamsetty stated that Plaintiff's claim was denied based on and RFC reflecting medical vocational factors of light work. (Tr. 107). Dr. Latchamsetty summarized Plaintiff's medical history and stated that the it was unclear what were the reasons for Plaintiff walking with a cane and

mobility problems that were observed during Dr. McLaughlin' May 2013 evaluation.  (Tr. 107).  Dr. Latchamsetty opined that "[t]here are no significant objective findings on exam to support this level of mobility impairment" and recommended clarification of Dr. McLaughlin' May 2013 mobility findings.  (Tr. 107).  Dr. Latchamsetty concluded that:

> Current evidence from treating source is needed regarding current symptoms, treatment, lab work and x-ray report of most involved joints to assess severity of arthritis and it's impact on ambulation. Without this evidence accurate RFC and credibility cannot be assessed.

(Tr. 107).

## 8.  Catherine Smith, M.D.

On June 4, 2013, Dr. Smith opined that Plaintiff could 1) occasionally lift and/or carry twenty pounds, frequently lift and/ or carry ten pounds; 2) stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; 3) sit for a total of six hours in an eight-hour workday; 5) unlimited ability to push and pull hand or foot controls; 6) occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and never crawl.  (Tr. 109-110).  Dr. Smith opined that Plaintiff did not have any manipulative, visual, or communicative limitations, however, opined that Plaintiff should avoid concentrated exposure to extreme heat or cold, wetness, humidity, noise, vibration, fumes, odors, poor ventilation, and hazards.  (Tr. 110-11).

In support of Dr. Smith's RFC opinion, she cited Plaintiff's medical conditions, the May 2013 examination report from Dr. McLaughlin, and partial credibility to Plaintiff's ADLs in sharing custody of a child, cooking, doing chores, shopping, and driving. (Tr. 111). Dr. Smith elaborated as support for her findings: 1) the 2008 cerebral CVA with left-sided weakness and acute kidney injury; 2) Dr. Ufondu noting on November 30, 2012 a history of hypertensive cardiomyopathy and diastolic dysfunction, and chronic kidney disease (Tr. 353-54); 3) Dr. McLaughlin's consultative evaluation dated May 14, 2013, noting that Plaintiff was not on rheumatoid arthritis medication, dyspnea on exertion after climbing one flight of stairs, lives alone, markedly antalgic gait using cane and needed it to arise from the chair, combined with other normal findings (Tr. 368). (Tr. 111).

On August 22, 2013, Dr. Smith again reviewed Plaintiff's record and opined that Plaintiff: 1) could occasionally lift and/or carry twenty pounds, frequently lift and/ or carry ten pounds; 2) could stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; 3) could sit for a total of six hours in an eight-hour work day; 4) was limited in the right lower extremity in his ability to push and pull foot controls due to his persistent right knee and ankle symptoms; 5) could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and never crawl or climb ladders. (Tr. 140-41). Dr. Smith opined that with regards to vision, Plaintiff had unlimited field of vision and near acuity, while having limited far

acuity in the right eye and limited depth perception bilaterally. (Tr. 141). Dr. Smith opined that Plaintiff did not have any manipulative or communicative limitations, however, opined that Plaintiff should avoid concentrated exposure to extreme heat or cold, wetness, humidity, noise, vibration, fumes, odors, poor ventilation, and hazards. (Tr. 141-42).

In support her RFC opinion, Dr. Smith cited Plaintiff's medical conditions, the May 2013 examination report from Dr. McLaughlin, and partial credibility to Plaintiff's ADLs in sharing custody of a child, cooking, doing chores, shopping, and driving. (Tr. 142). Dr. Smith elaborated as support for her findings: 1) the 2008 cerebral CVA with left-sided weakness and acute kidney injury; 2) Dr. Ufondu treatment notes from November 2012, May 2013, July 2013; 3) Dr. McLaughlin's consultative evaluation dated May 14, 2013, noting that Plaintiff was not on rheumatoid arthritis medication, dyspnea on exertion after climbing one flight of stairs, lives alone, markedly antalgic gait using cane and needed it to arise from the chair, combined with other normal findings. (Tr. 142). Dr. Smith also determined that Plaintiff's past relevant work from June 1986 to June 2006 fell under DOT Title "floor broker" with DOT code 162.167-034 and customer service representative from June 2006 to October 2008. (Tr. 143). Dr. Smith opined that Plaintiff had an RFC to perform his past relevant work as generally performed in the national economy. (Tr. 143). Dr. Smith determined that Plaintiff was not

disabled and that there was no evidence of any substance abuse disorder or DAA issue. (Tr. 144).

Again on October 25, 2013, Dr. Smith reviewed Plaintiff's record. (Tr. 156-59). Dr. Smith indicated that she gave great weight to the consultative examinations from May 14, 2013, and October 11, 2013, noting that each "[r]elied heavily" on Plaintiff's subjective report. (Tr. 157). Dr. Smith's opinion was mostly the same as the one rendered on August 22, 2013, (compare Tr. 140-44 *with* Tr. 156-59) with the exception that she indicated that plaintiff did not have any visual limitations (Tr. 158) but still notes that he has a right eye problem (Tr. 159), an opinion which she had previously expressed in her original RFC assessment rendered on June 4, 2013 (Tr. 110-11).

### 9. Psychiatric Review Technique: John Rohar, Ph.D.

On August 21, 2013, Dr. Rohar reviewed Plaintiff's medical records and concluded that Plaintiff had an organic mental disorder that did not satisfy the criteria for Listing 12.02 and that Plaintiff's mental impairments presented no restriction of ADLs, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and that Plaintiff did not experience repeated episodes of decompensation, each of extended duration. (Tr. 121). Dr. Rohar opined that the evidence did not establish the presence of any "C" criteria for Listing 12.02. (Tr. 121). In support of his findings Dr. Rohar

explained that Plaintiff had a "remote [history] of CVA. ADL's [were] largely intact. No reference to a [history of mental health treatment]." (Tr. 121).

On October 22, 2013, Dr. Rohar reviewed Plaintiff's medical records. (Tr. 145-56). Dr. Rohar addressed other opinions that placed greater restrictions on Plaintiff's abilities. (Tr. 159-60). Dr. Rohar stated that the consultative examinations May 14, 2013, and October 11, 2013, presented "an overestimate[ion] of the severity of [Plaintiff's] restrictions /limitations and based only on a snapshot of the individual· s functioning." (Tr. 159-60). Identical to Dr. Smith's August 22, 2013, opinion (143), Dr. Rohar determined that Plaintiff's past relevant work from June 1986 to June 2006 fell under DOT Title "floor broker" with DOT code 162.167-034 and customer service representative from June 2006 to October 2008. (Tr. 160). Dr. Rohar opined that Plaintiff had an RFC to perform his past relevant work as generally performed in the national economy. (Tr. 161). Dr. Rohar determined that Plaintiff was not disabled and that there was no evidence of any substance abuse disorder or DAA issue. (Tr. 161).

### 10. Nepa Imaging Center, Consultative Examination Report: Jonathon Sullum, M.D.

On October 11, 2013, Dr. Sullum interpreted X-rays of Plaintiff's right knee and described:

> AP and lateral views reveal a well-preserved joint space. There are small degenerative marginal spurs laterally. There is no sign of recent or remote fracture. Lateral view reveals mild soft tissue fullness in the

suprapatellar bursa. Patellofemoral Joint appears preserved.

(Tr. 399).  Dr. Sullum concluded that Plaintiff had "mild osteoarthritis involving the lateral joint compartment," and "small joint effusion."  (Tr. 399).

### 11. Consultative Examination Report: Rosemary Szollas, M.D.

On October 11, 2013, Plaintiff was evaluated by Dr. Szollas.  (Tr. 402-420). Dr. Szollas reviewed "several primary care and cardiology office notes," report of lab results ordered on 05/07/2013, and an undated EKG report with no abnormalities noted.  (Tr. 408-09).  Plaintiff reported a history of congestive heart failure (CHF), a stroke in 2008, arthritis in the lower extremities and hands, memory disturbances, hypertension with severe uncontrolled blood pressure for the past 10+ years, and complaints of visual difficulties with regards to the right eye since his stroke in 2008.  (Tr. 402).  Plaintiff reported that his medications control his CHF.  (Tr. 402).  Plaintiff reported hospitalizations in 2009 and 2010 as a result of the congestive heart failure.  (Tr. 403).  In 2010 Plaintiff reported having a GI bleed which resulted in a significant amount of blood loss and a transfusion and caused an exacerbation of his congestive heart failure.  (Tr. 403).  Plaintiff did not report experiencing lower leg swelling, paroxysmal nocturnal dyspnea, or any palpitations when questioned.  (Tr. 403).

Plaintiff reported shortness of breath on exertion, specifically stating that he could only walk approximately 200 feet until he has severe shortness of breath and

weakness and he has to stop and rest.  (Tr. 403).  Plaintiff reported that after climbing up one flight of stairs he has significant shortness of breath to the point where he must rest before he can go on.  (Tr. 403).  Plaintiff denied any near syncope or syncope with shortness of breath.  (Tr. 403).  When asked if he was aware of the etiology of his congestive heart failure, Plaintiff believed the cause to be due to his severe uncontrolled high blood pressure.  (Tr. 403).

Plaintiff reported that due to the October 2008 stroke, he experienced some left upper extremity paralysis and some right visual acuity difficulties since the stroke.  (Tr. 403).  Plaintiff reported "no residual paralysis defects as a result of the stroke in terms of function of his extremities . . .  however, [he reported] right-sided visual field shadiness or fogginess, or an unclear visual field which has been constant since 2008."  (Tr. 403).  Dr. Szollas noted allegations of arthritis in the lower extremities and upper extremities manifested as bouts of inflammation and swelling of the right ankle and knee, to the point where it has caused him to be non-ambulatory due to pain.  (Tr. 404).  Plaintiff reported that his intermittent flare-ups which occur approximately monthly and can last up to seven days, where the right knee or ankle becomes very swollen and painful.  (Tr. 404).  Plaintiff denied having a current diagnosis of gout although it was considered in the past, and Dr. Szollas noted that she had no records to confirm or deny the diagnosis of gout.  (Tr. 404).  Plaintiff reported that in the past a physician diagnosed him with

rheumatoid arthritis.  (Tr. 404).

Plaintiff reported a history of memory problems and difficulty remembering things since the stroke in 2008.  (Tr. 404).  Plaintiff denied any loss of losing his way or forgetfulness in terms of individuals or family members, however, he does report forgetting daily tasks and daily schedules.  (Tr. 404).  Dr. Szollas noted that although Plaintiff had been apparently well controlled in terms of his congestive heart failure:

> I have no indication or reports of control of his chronic renal failure. He was advised apparently to seek treatment by a nephrologist but he reports he does not have the money to do so. He states that his primary care physician recommended he see a nephrologist and his cardiologist recommended this as well.

(Tr. 404).

Upon examination, Dr. Szollas observed that Plaintiff came without ambulatory aids and ambulated into the examination room with a normal gait which was "not unsteady, lurching or unpredictable."  (Tr. 406).  Plaintiff was able to "stand unassisted and able to rise from the seated position and step up and down from the examination table without difficulty or assistive devices."  (Tr. 406).  Dr. Szollas observed that Plaintiff "appeared comfortable both in the seated and supine position" and was "able to understand normal spoken speech and follow instructions and has a good knowledge of recent and remote medical history."  (Tr.

406).   Plaintiff's initial blood pressure was 140/88 and BMI was 36.  (Tr. 406).

With regards to Plaintiff's eyes and vision Dr. Szollas observed:

> The pupils are equal, round, and react to light and accommodation.
> The extraocular muscles are intact. There is no scleral icterus.
> Undilated funduscopio examination reveals no evidence of
> hypertensive or diabetic retinopathy. Visual acuity is 20/30 in the left
> eye. The claimant seated he has no visual ability in the right eye when
> visual acuity was tested. He states he cannot perform this exam in the
> right eye. Testing was done without corrective lenses. Peripheral
> visual field testing was performed in the examination room and was
> within normal limits on both the right and left sides.

(Tr. 406).  Dr. Szollas  also observed that the shoulders, elbows, hands, and wrists

were nontender and without any redness, swelling or warmth. (Tr. 407).  Plaintiff

was able to make a fist bilaterally, open a jar, open a door, pick up coins, write,

and use the hands to button and unbutton without problem.  (Tr. 407).  Plaintiff's

grip strength measured stronger on the right than on the left.    (Tr. 407).

Examination of the hips, ankles and knees revealed no tenderness, redness or

warmth, no laxity, crepitus, or clicks. (Tr. 407-08).   However, Dr. Szollas noted

that "[t]here was a mild degree of generalized swelling throughout the [right] knee

but no effusion noted. (Tr. 407).  Evaluation of the dorsolumbar spine revealed no

abnormalities and Plaintiff was able to stand on one leg at a time without difficulty.

(Tr. 408).  Dr. Szollas also found 5/5 strength in the upper and lower extremities

bilaterally and that there was no evidence of muscle weakness or atrophy.  (Tr.

408).  Dr. Szollas also observed that Plaintiff was able to walk on the heels, walk

on the toes, and walk heel-to-toe and squat without difficulty. (Tr. 408).

Dr. Szollas opined that Plaintiff had: 1) chronic congestive heart failure; 2)

severe chronic hypertension; 3) chronic renal failure; 4) history of cerebrovascular

accident in 2008; 5) bilateral leg arthritis of unknown type; 6) memory loss; 7)

hypercholesterolemia.  (Tr. 409).  Dr. Szollas recommended that Plaintiff seek

nephrology consultation regarding management of his chronic renal disease and

that Plaintiff:

> should undergo more extensive evaluation with regards to right eye
> and left eye examination due to visual field complaints, as our
> examination was inconclusive regarding the right eye. Again, during
> the examination today peripheral field visual testing was within
> normal limits in both the right and left eye, however, the Snellen eye
> exam was not performed per [Plaintiff] stating an inability to perform
> that exam in the right eye.

 (Tr. 409).

Dr. Szollas attached a Range of Motion form and a Medical Source

Statement form.  (Tr. 412-19).  Dr. Szollas noted that Plaintiff had; 1) full range of

motion for his shoulders, elbows, ankles, wrists, and hips bilaterally; 2) flexion and

extension up to 140 degrees for both knees; 3) for the lumbar region, flexion-

extension to eighty degrees out of ninety, and full right and left lateral flexion; and,

4) for the cervical region, left and right lateral flexion of thirty degrees out of forty,

full general flexion and extension of twenty degrees out of thirty degrees, and a right and left rotation for forty degrees out of forty-five degrees. (Tr. 412-13).

Dr. Szollas opined that Plaintiff could occasionally lift up to fifty pound, never lift anything fifty-one pounds or greater, could occasionally carry up to twenty pounds and never carry anything twenty-one pounds or greater. (Tr. 414). In support of this opinion Dr. Szollas cites Plaintiff's reported history of CHF and dyspnea. (Tr. 414). Dr. Szollas opined that Plaintiff could sit for six hours, stand for two hours and walk for twenty minutes at a given time and opined that Plaintiff could sit six hours, stand two hours, and walk ten to twenty minutes in a work day. (Tr. 415). Dr. Szollas opined that Plaintiff did not need to use a cane to ambulate. (Tr. 415).

Dr. Szollas noted that Plaintiff was left-hand dominant and opined that Plaintiff could frequently reach overhead, reach in general, handle, finger, feel, push and pull with both hands. (Tr. 416). In support for her opinion, Dr. Szollas stated that Plaintiff had not demonstrated physical findings that would limit his ability to do the above-mentioned tasks. (Tr. 416).

Dr. Szollas opined that Plaintiff could occasionally operate foot controls with his right and left feet, citing that Plaintiff reported intermittent severe exacerbations of pain, swelling, and arthritis of the lower extremities. (Tr. 416). Dr. Szollas also opined that Plaintiff could occasionally climb ladders and

scaffolds, kneel, and crawl and could frequently climb stairs and ramps, balance, stoop, and crouch. (Tr. 417). Dr. Szollas explained that these limitations reflect Plaintiff's report of shortness of breath upon exertion, history of CHF, and lower extremity pain and swelling. (Tr. 417).

Dr. Szollas indicated that Plaintiff's impairments do not affect his vision explaining that although Plaintiff reported difficulty with visual acuity in the right eye, such was not clearly demonstrated upon examination. (Tr. 417). Thus Dr. Szollas opined that Plaintiff was able to read very small print and view a computer screen with the left eye and indicated it is unclear of his ability to do the same with the right eye. (Tr. 417). Dr. Szollas further opined that Plaintiff could avoid ordinary workplace hazards and obstacles, could read ordinary newspaper print, and determine differences in shape and color of small objects. (Tr. 417).

Dr. Szollas opined that Plaintiff: 1) could never be exposed to unprotected heights; 2) could occasionally be around humidity or vibrations; and, 3) could frequently operate a moving vehicle, could be exposed to moving mechanical parts, be exposed to extreme heat or cold, dust, odors, and pulmonary irritants. (Tr. 418). Dr. Szollas wrote that Plaintiff could: 1) shop; 2) travel independently; 3) ambulate without using a wheelchair, walker, two canes or two crutches; 4) could prepare simple meals and feed himself; 5) care for his personal hygiene; and, 6) sort, handle, and use paper. (Tr. 419). Dr. Szollas opined that the above-

described limitations have lasted or would last for twelve months consecutively. (Tr. 419).

## C. Self-Reports and Testimony

In a function report dated March 18, 2013, Plaintiff reported that he "constantly" experience pain in his joints. (Tr. 215). Plaintiff detailed that it was very difficult to walk at times and due to his congestive heart failure, he is completely out of breath. (Tr. 215). Plaintiff stated that his eyesight had been damaged since his stroke and it was very difficult to read fine print. (Tr. 215). Plaintiff wrote that he could no longer walk or run and that he also used to be a singer in a band and can no longer do that due to his medical impairments. (Tr. 216). According to Plaintiff his joint pain prevents him from sleeping and occasionally his breathing problems wake him up. (Tr. 216). Plaintiff indicated that he has no problem with personal care. (Tr. 216). Plaintiff stated that he constantly needs reminders to take his blood pressure medicine. (Tr. 217). Plaintiff reported that he makes sandwiches once a day due to the fact that he is not able to stand for a long period of time. (Tr. 217). Plaintiff does laundry once a week, if he can walk to the washer and does ironing. (Tr. 217). Plaintiff indicated that he does not do house or yard work because of his pain, dizziness, and always being out of breath. (Tr. 218). Plaintiff reported that he goes outside once a week due to the difficulties of going up and down the stairs to his third-story apartment.

(Tr. 218).  Plaintiff says that he can climb one flight of stairs before he is winded and he holds on to the bannister and pulls himself up one step at a time.  (Tr. 220).  Plaintiff said that he could walk about fifty feet before needing to stop and rest for long enough for his heart to stop pounding.  (Tr. 220).

Plaintiff wrote that when he goes out, he travels by car, he cannot travel a long distance, and he goes out once a week for food and once every three months for medication.  (Tr. 218).  Plaintiff reported that his is able to handle his finances. (Tr. 218).

Plaintiff reports that for socializing he only does activities with his son which includes using his cane to go out to the movies twice a week.  (Tr. 219).  Plaintiff reported that his entire social life has been destroyed by the onset of his disability and that he does not socialize anymore.  (Tr. 220).  Plaintiff reported that he could not pay attention for long and that he "drift[s] off," that he does not finish what he starts, such as conversations, reading, or watching a movie, and he does not follow written instructions well, and he could follow spoken instructions only if he remembers them.  (Tr. 220).  Plaintiff reported that he does not handle stress well due to his severe high blood pressure, he does not handle changes well, and he is now afraid that he will die and experiences depression.  (Tr. 221).

Plaintiff reported that he uses crutches, cane, brace/splint, and glasses, and that the cane and crutches were approximately prescribed around 2009.  (Tr. 221).

Plaintiff reported that he uses an ambulatory device whenever the weather is humid and exacerbates his joint pain and sometimes to aid in standing up and walking. (Tr. 221).   Plaintiff reported that his medication side effects include impaired judgement, dizziness, and extreme drowsiness.  (Tr. 222).  Plaintiff reported that the because of his illness he is afraid to do normal activities out of fear that such activities would exacerbate his symptoms, and even the function reported was filled out by his girlfriend as he dictated since he was unable to compete the form on his own.  (Tr. 222).  Plaintiff reported that the onset of his disability was when he had a stroke on October 31, 2008, which brought on joint pain to his toes, ankles, knees, and wrists.  (Tr. 223).  Plaintiff reported that he experiences daily pain and flare-ups in his legs can last more than eight days.  (Tr. 223).

In a work history report dated February 13, 2013, Plaintiff indicated that his past work from June 2006 to October 2008 as a customer service representative generally entailed two hours of walking, two hours of standing, four hours of siting, the use of machines or equipment, technical knowledge, and writing.  (Tr. 229).  For his previous job as a floor operations clerk from June 1986 to June 2006, Plaintiff described that he would walk or stand for eight hours and no sitting was allowed.  (Tr. 230).  Plaintiff reported that he would need to crouch for about an hour a day, occasionally handle big objects, used a computer and wrote as a part of the job.  (Tr. 230).  Plaintiff did not have to reach, kneel, crawl, or handle small

objects. (Tr. 230). In this position Plaintiff had to lift boxes of work that was over 150 pounds at least once a month. (Tr. 230).

On April 23, 2014, Plaintiff testified during a hearing before the ALJ. (Tr. 53-100). Plaintiff testified that he drives once a week and goes grocery shopping once a month by himself, with a neighbor occasionally helping him bring his groceries up to his home. (Tr. 58, 62-63). Plaintiff has weekend custody of his 13-yr-old child. (Tr. 59). Plaintiff reported that he watches the television most of the day and uses his child's iPad to see what his old band is doing and look up movies. (Tr. 63-64). Plaintiff reported that he used to walk around the mall with his son, but more recently, he is in pain and cannot walk around as much so they spend fifteen to twenty minutes there. (Tr. 64).

Plaintiff testified that he received unemployment benefits for a year in 2008 and that he stopped working in 2008 because his employer was downsizing and they let him go. (Tr. 59). Plaintiff testified that he no longer had health insurance and ran out of money, could no longer afford to get his prescriptions filled, and had last refilled his medication around seven months prior. (Tr. 61). Plaintiff testified that he makes hamburgers, grills hotdogs, does light cleaning, and does his own laundry in his apartment. (Tr. 62).

When the ALJ inquired if Plaintiff used a ramp or stairs to get to his home, Plaintiff responded that he climbs "thirty-five steps," or three flights to get to his

apartment. (Tr. 57). When Plaintiff's attorney inquired about whether there was any difficulties with climbing the stairs, Plaintiff responded that he gets up the first seventeen steps before he has to stop at the landing for a couple of minutes to catch his breath, then go up the next nine steps and take a shorter break, and then go up the final nine steps and must sit down in his home to rest because he is out of breath. (Tr. 66-67). Plaintiff stated "I'm totally out of breath. It's ridiculous." (Tr. 67). Plaintiff detailed that he had to hold the railings to pull himself up the stairs and while going upstairs is harder due to going against gravity, but going downstairs is hard on his joints. (Tr. 67). Plaintiff testified that he experiences shortness of breath every time he goes up and down the stairs and with exertion. (Tr. 67).

### III.   Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and, (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work

experience can perform.  *Id.*  The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence is a deferential standard of review.  *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## IV.   Analysis

## A. Credibility

The ALJ stated that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 17).  Plaintiff argues that the ALJ's above quoted boilerplate language is "insufficient to support an adverse credibility finding as it is unreviewable."  Pl. Brief at 14.  Plaintiff argues that "there is no way to determine which evidence was provided what weight by the ALJ as it pertains to credibility of the Plaintiff."  Pl. Brief at 14.

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p.  The credibility finding must be based on a consideration of the entire case record, considering several factors in totality.  SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Weidman v. Colvin*, No. 3:14-CV-0552-MEM-GBC, 2015 WL 6673830, at *24-33 (M.D. Pa. Aug. 7, 2015) *report and recommendation adopted*, No. CV 3:14-552, 2015 WL 5829788 (M.D. Pa. Sept. 30, 2015).  There is a distinction between what an adjudicator must "consider" and what the adjudicator must explain in the disability determination.  *See* SSR 06-03p

(explaining that to "consider" means to provide explanation sufficient for a "subsequent reviewer to follow the adjudicator's reasoning"); *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (social security regulations enumerating factors of an ALJ to consider "require only that the ALJ's decision include 'good reasons' . . . not an exhaustive factor-by-factor analysis").

If explanation allows meaningful judicial review, it suffices. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir.2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir.2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."); *Varano v. Colvin*, No. 3:14-CV-001467-GBC, 2015 WL 5923615, at *9 (M.D. Pa. Oct. 9, 2015).  Although Plaintiff asserts that the ALJ's credibility determination is "unreviewable," he has argued that the ALJ erred in his credibility finding with regard to Plaintiff's inconsistent use of a cane, his subjective complaints, and ability to climb stairs.  Pl. Brief at 11-13, 16-17.

The ALJ observed that "[Plaintiff] has a very good work history with the same company, however, he testified that he stopped working because 'they let me

go, cutting back and downsizing' . . . [Plaintiff] collected unemployment compensation for a year." (Tr. 14).  It was permissible for the ALJ to consider Plaintiff's work history, non-health related reasons for stopping work, and motivation to work as factors in determining Plaintiff's credibility. *See e.g.*, *Kane v. Colvin*, No. 3:13-CV-02469, 2015 WL 1513960, at *12 (M.D. Pa. Mar. 31, 2015) (noting that the plaintiff reported she was laid off because there was "not enough work for her," not because she was unable to work due to disability); *Pachilis v. Barnhart*, 268 F. Supp. 2d 473, 483 (E.D. Pa. 2003) (finding that a claimant incentive or disincentive to work is a permissible criterion bearing on his credibility).

Although Plaintiff argues that the ALJ did not cite enough contrary medical evidence to support the ALJ's adverse credibility finding (Pl. Brief at 17-19); the ALJ also relied on medical evidence to support Plaintiff's ability to work.  (Tr. 15-21).  Tthe ALJ summarize medical records indicating when Plaintiff's symptoms were mild or stable, Plaintiff had a nearly full range of motion in all major joint groups, had a normal gait, and where medical professionals opined that Plaintiff could return to normal activity.  (Tr. 15-17).  The ALJ noted that Plaintiff's alleged severity of symptoms contradicted with the observations of Dr. Szollas during the October 2013 examination.  (Tr. 18, 20).  The ALJ also highlighted how the alleged severity of Plaintiff's symptoms contradicted with the May 2013 opinion of

Dr. Siegel, the June 2013, and the August 2013, and October 2013 opinions of Dr. Smith which enumerated Plaintiff's physical and mental capabilities including the ability to remember, walk, sit, stand, and manipulate objects.   (Tr. 18-19). Resolving conflicting evidence, conflicting medical opinions, and relying on the opinions of medical experts are proper factors to be considered in the credibility assessment.   *See* SSR 96-7p; 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation).

The ALJ also noted inconsistencies between Plaintiff's reports and other evidence in the record. (Tr. 14-20).  The ALJ noted that although Plaintiff "stated that he is not treating with any specialists because he does not have insurance," he "made no attempt to go to a specialist for his kidney disease even when he had insurance."   (Tr. 14-15, 16).   The ALJ also noted Plaintiff's repeated noncompliance with treatment.  (Tr. 16-17).  The ALJ noted that "[Plaintiff] was able to follow instructions and he had a good knowledge of his recent and remote medical history. This contradicts the claimant's testimony of difficulty with memory."  (Tr. 18).

Based on the above, the Court finds no reversible error in the ALJ's credibility analysis.

## B. Whether ALJ Impermissibly used Lay Interpretation

Plaintiff argues that the:

> ALJ offered only one basis supporting this credibility finding. (17). "[A]n x-ray of [Plaintiff's] right knee on October 11, 2013 showed mild osteoarthritis involving the lateral joint compartment and small joint effusion." (Tr. 17).  The ALJ cited no evidence or authority that such objective findings do not support Mr. Ferrante's limitations. Instead, the ALJ implicitly attempted to interpret raw medical data (the October 11, 2013 xray). Such an attempt to review and interpret raw data by an ALJ is impermissible.

Pl. Brief at 13.   The Court finds Plaintiff's argument unpersuasive.   "Medical opinions are statements from ... acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including ... symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); *see also Wrights v. Colvin*, No. 3:13-CV-02516-GBC, 2015 WL 2344948, at *10 (M.D. Pa. May 14, 2015).  As an initial matter, the ALJ was not interpreting actual X-rays, rather the ALJ was citing the opinion of Dr. Sullum who interpreted the X-rays and concluded that Plaintiff had "mild osteoarthritis involving the lateral joint compartment," and "small joint effusion." (Tr. 399).  As discussed above, the ALJ cited many factors regarding Plaintiff's credibility, including objective evidence, Plaintiff's ADLs, and medical opinions, and inconsistencies in the evidence. The Court finds no reversible error.

## C. Characterization of Plaintiff's Stair Climbing Testimony

Plaintiff argues that the ALJ mischaracterizes Plaintiff's testimony regarding his ability to climb stairs.  Pl. Brief 15-17.

In the decision the ALJ noted that: Plaintiff "sometimes asks his neighbor to help him carry the groceries up the stairs" (Tr. 12); Plaintiff "testified that he is able to climb 35 steps to get to his third floor apartment where he lives alone" (Tr. 14); "Dr. Smith opines that the claimant can occasionally . . . climb ramps and stairs . . . ." (Tr. 19); and although Dr. McLaughlin opined that Plaintiff could never climb stairs, the ALJ found that such was inconsistent with Plaintiff testifying that "he climbs stairs to the third floor where his apartment is located and thus showing an ability to climb stairs" (Tr. 20).

Significantly, the ALJ gave weight to Dr. Smith's opinion which concluded that Plaintiff could occasionally climb stairs and the ALJ included this assessment in Plaintiff's RFC.  The purpose of the ALJ highlighting that Plaintiff is capable of climbing thirty-five stairs was to demonstrate why he gave less weight to Dr. McLaughlin's opinion that Plaintiff could "never" climb stairs.  *See* (Tr. 20).

The Court finds no reversible error in the ALJ's assessment of Plaintiff's ability to climb stairs.

## D. Negative Evidence and Cane Usage

Plaintiff argues that:

the ALJ relies upon a negative inference to support her failure to include the use of a cane in the RFC assessment. Specifically, the ALJ found that "there is no mention of the use of a cane in the records". (Tr. 17). This analysis too is in error. First, the ALJ fails to consider that while Plaintiff's primary care physician did not specifically state that a cane was required, the primary care physician did not state that a cane is not required. This is an impermissible negative inference.

Pl. Brief at 11-12.

The Court finds that the use of negative evidence is permissible in SSA adjudications and the ALJ's use of negative evidence was proper in this instance. *Cf.* SSR 96–7p (allowing adverse inference from lack of treatment); *AZ v. Shinseki*, 731 F.3d 1303, 1315-18 (Fed. Cir. 2013); *Fountain v. McDonald*, 27 Vet. App. 258, 272 (2015); *Burnside v. Colvin*, No. 3:13-CV-2554, 2015 WL 268791, at *16 (M.D. Pa. Jan. 21, 2015) (addressing adverse inference from lack of treatment).

The Federal Rules of Evidence are not binding on SSA adjudicators. *See* 42 U.S.C. § 405(b)(1); 20 C.F.R. §§ 404.950(c), 416.1450(c) ("The administrative law judge may receive evidence at the hearing even though the evidence would not be admissible in court under the rules of evidence used by the court."); *Richardson v. Perales*, 402 U.S. 389, 400, 409-10 (1971) ("[S]trict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent").[2]  However, the Court finds that cases

---

[2] *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1218 at n.4  (9th Cir. 2005) ("The Federal Rules of Evidence do not apply to the admission of evidence in Social Security administrative proceedings."); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (concluding that federal rule regarding expert testimony does not apply to disability adjudications, yet the principles were

addressing the federal negative evidence rule and its application to administrative agency adjudications to be instructive. *See AZ v. Shinseki*, 731 F.3d 1303, 1315-18 (Fed. Cir. 2013) (addressing negative evidence rule to VA disability determination); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (addressing expert witness rule to social security determination); *Fountain v. McDonald*, 27 Vet. App. 258, 272 (2015) (addressing negative evidence rule to VA disability determination).

The Federal Circuit in *AZ v. Shinseki*, relied on the Federal Rules of Evidence for persuasive authority as to how negative evidence rules should apply to ALJ decisions in veteran disability claims. *AZ v. Shinseki*, 731 F.3d 1303, 1315-18 (Fed. Cir. 2013). The court in *AZ v. Shinseki*, detailed the history and scholarship of the use of negative evidence in treatises, across the federal courts applying "common law evidentiary principles," and in Rules 803(7) and 803(10) of the Federal Rules of Evidence. *AZ v. Shinseki*, 731 F.3d 1303, 1315-18 (Fed. Cir. 2013). The court in *AZ v. Shinseki* observed that the "absence of certain evidence may be pertinent if it tends to disprove (or prove) a material fact." *AZ v. Shinseki*,

---

still instructive); *Puckett v. Chater*, 100 F.3d 730, 734 (10th Cir. 1996) ("Although it would seem good practice to follow in an administrative hearing, the applicable regulations do not require the ALJ to adhere to the Federal Rules of Evidence."); *Rocker v. Celebrezze*, 358 F.2d 119, 122 (2d Cir. 1966) (observing that "the trial examiner was not obliged to apply the rigid rules of evidence utilized in a formal trial"); *Bailey v. Astrue*, No. CIV.A. 07-4595, 2009 WL 577455, at *11 n.5 (E.D. Pa. Mar. 4, 2009); *Henley v. United States*, 379 F. Supp. 1044, 1051 (M.D. Pa. 1974) ("We are well aware that the rules of evidence applicable in a court are more stringent than those of an administrative agency").

731 F.3d 1303, 1311 (Fed. Cir. 2013).[3]  In *Fountain v. McDonald*, the United States Court of Appeals for Veterans Claims recognized that once there is a proper foundation an ALJ "may weigh a claimant's lay statements against the absence of contemporary medical evidence." *Fountain v. McDonald*, 27 Vet. App. 258, 272 (2015).

Where a sufficient foundation to consider negative evidence is met, an ALJ may draw adverse inferences from the lack of treatment.[4]  *Cf.* SSR 96–7p; *Burnside v. Colvin*, No. 3:13-CV-2554, 2015 WL 268791, at *16 (M.D. Pa. Jan. 21, 2015).  An ALJ provides a sufficient foundation for negative evidence where the ALJ considered "other information in the case record, that may explain" the silence in records or absence of medical treatment.  *Cf. id.*  In other words, as long as an ALJ considered the reasons giving rise to the negative evidence, an ALJ has made a proper foundation for consideration of negative evidence.  *See e.g.*, SSR 96–7p; *Burnside v. Colvin*, No. 3:13-CV-2554, 2015 WL 268791, at *16 (M.D. Pa. Jan. 21, 2015) (discussing adverse inferences from the lack of medical treatment

---

[3] The Third Circuit has recognized that the "negative evidence rule has been adopted by the federal courts but by the weight of the decisions it has been so formulated as to turn upon the circumstances of each individual case." *Eiseman v. Pennsylvania R. Co.*, 151 F.2d 222, 224 (3d Cir. 1945).  In *DeMarines*, the Third Circuit considered negative evidence as admissible but having less weight than contradictory positive evidence.  *See DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3d Cir. 1978).

[4] The Court finds that when there is proper foundation, negative evidence is permissible and not the "speculative inference" disfavored in our jurisdiction.  *See, e.g.*, *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("[A]n ALJ may not make speculative inferences from medical reports"); *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981).

require addressing possible reasons for the lack of treatment); *Fountain v. McDonald*, 27 Vet. App. 258, 272 (2015) (discussing the foundation for negative evidence).   In this instance, the ALJ laid a proper foundation by inquiring of Plaintiff his reason for not using the cane at the hearing and noting Plaintiff's response that he uses the cane but left it in the car.  (Tr. 17).  Such is sufficient to support an inference that the omissions of Plaintiff's cane use in other records were also due to Plaintiff's volition.

In this instance, the ALJ did not err in noting that "there is no mention of the use of a cane in the records from his primary care physician, cardiologist or at the next consultative examination" because in the context of the ALJ's analysis, this observation is to demonstrate a material fact of *inconsistent* use of the cane, not that Plaintiff never used a cane.  Several courts have found that an ALJ may draw an adverse inference from the inconsistent use of a cane.  *See e.g.*, *Cimini v. Colvin*, No. CIV.A. 14-30048-MGM, 2015 WL 1206361, at *5 (D. Mass. Mar. 16, 2015) (substantial evidence supports the ALJ's adverse inference from Plaintiff stating that she always used her cane contrasting to medical evidence indicating that she had ceased using a cane two months prior); *Despas v. Colvin*, No. C-14-0681 DMR, 2015 WL 899953, at *6 (N.D. Cal. Mar. 2, 2015) (rejecting argument that ALJ's inference and resolution of conflict in evidence was improper where the ALJ found the plaintiff's testimony regarding the use of a cane inconsistent with a

medical report that noted the plaintiff did not use any assistive devices); *Bilak v. Colvin*, No. 2:12-CV-05956, 2013 WL 4047733, at *10 & n.8 (D.N.J. Aug. 9, 2013) (determining that the ALJ properly considered medical opinion evidence where the ALJ explained that the doctor's opinion that the plaintiff needed a cane to ambulate was an inconsistency with the record because there is no medical evidence that plaintiff had any abnormality in her gait).  The driving purpose for obtaining a second consultative examination in October 2013 by Dr. Szollas was to address Plaintiff's extreme presentation of antalgic gait and use of a cane in the initial May 2013 consultative examination by Dr. McLaughlin and because the same symptoms where not shown consistently throughout the records. *See* (Tr. 107) (Dr. Latchamsetty's opinion).  In the initial disability determination, Dr. Latchamsetty summarized Plaintiff's medical history and stated that it was unclear what the reasons were for Plaintiff walking with a cane and mobility problems that were observed during Dr. McLaughlin's May 2013 evaluation.  (Tr. 107).  Dr. Latchamsetty opined that "[t]here are no significant objective findings on exam to support this level of mobility impairment" and recommended clarification of Dr. McLaughlin' May 2013 mobility findings.  (Tr. 107).  Dr. Latchamsetty concluded that more medical evidence was needed to assess severity of arthritis and its impact on ambulation and "without this evidence[, an] accurate RFC and credibility cannot be assessed."  (Tr. 107).

Moreover, the ALJ was highlighting the contradiction in the statement that Plaintiff "needs a cane to walk and cannot go without a cane" and clear instances where, to the contrary, he was mobile without the cane. (Tr. 17). The inconsistent use of the cane also is probative on the matter of weight the ALJ gave to Dr. McLaughlin's opinion and to what degree Plaintiff's symptoms at the time of the evaluation, reflect an issue of credibility, an anomaly, or flare-up, rather than a picture of Plaintiff's daily symptoms. The focus of the ALJ's reference is the inconsistent use of the cane and the lack of using a cane at all times contradicts Dr. McLaughlin's statement that Plaintiff must always use a cane. Evidence can be used to discount a Plaintiff's credibility or accord a medical opinion less weight if such evidence demonstrates a contradiction or inconsistency. *See Pacifico v. Colvin*, No. 1:14-CV-1280, 2015 WL 5695271, at *13 (M.D. Pa. Sept. 28, 2015); *Gartland v. Colvin*, No. 3:13-CV-02668-GBC, 2015 WL 5695311, at *18 (M.D. Pa. Sept. 28, 2015) (discussing factors in weighing medical opinions); *see also Smith v. Astrue*, 359 Fed.Appx. 313, 317 (3d Cir. 2009) (claimant's testimony that she was essentially bedridden contradicted by evidence that she had been primary caretaker for small child for two years).

The ALJ noted that Dr. Szollas observed that Plaintiff did not have an antalgic gait, and could ambulate well without an ambulatory aid. (Tr. 18, 415). The ALJ also gave weight to the August 2013, and October 2013 opinions of Dr.

Smith which enumerated Plaintiff's capabilities including the ability to walk, sit, climb stairs, and stand. (Tr. 18-19).

Plaintiff fails to explain how the occasional use of a cane conflicts the RFC's range of light work. Moreover, the ALJ noted that the Vocational Expert (VE) identified sedentary jobs available to Plaintiff.[5] (Tr. 21). The ALJ stated:

> There are also significant jobs that exist in the economy that the claimant is capable of performing. For instance, even if the claimant had a residual functional capacity in the sedentary range, the Vocational Expert found jobs that the claimant would be able to perform with a sedentary exertional residual functional capacity which also provided transferable skills for the age of 50 years old.

(Tr. 21). During the hearing, the VE considered Plaintiff's professional status, Plaintiff was also capable of sedentary jobs such as: switchboard operator, DOT code 235.662-022; telephone solicitor, DOT code 299.357-014, and; information clerk/receptionist, DOT code 237.367-038. (Tr. 84-85).

Sufficient evidence supports the ALJ's reliance on Dr. Smith's opinions in formulating the RFC and the Court finds no reversible error in the ALJ's omission of cane usage from the RFC.

---

[5] Social Security policy contemplates the performance of sedentary work while constantly using a cane. Social Security Ruling 96–9p provides:

> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand.

SSR 96–9p. The need to use a cane is not inconsistent with the ability to perform sedentary work. *See* SSR 96–9p. *Accord McGuire v. Colvin*, No. C14-249-RSM, 2014 WL 7151774, at *7 (W.D. Wash. Dec. 15, 2014).

## E. Rheumatoid Arthritis

Plaintiff argues that the ALJ erred by failing to include Plaintiff's rheumatoid arthritis as an impairment at Step 2. Pl. Brief at 8. Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the disease or impairment rather than the mere diagnosis of the disease or name of the impairment. *See Alexander v. Shalala*, 927 F.Supp. 785, 792 (D.N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *accord*, *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006); *See also Burnside v. Colvin*, No. 3:13-CV-2554, 2015 WL 268791, at *12-13 (M.D. Pa. Jan. 21, 2015) (finding no reversible error in the ALJ's characterization of Plaintiff's impairment as "ML strain" rather than "disc herniation at C4/5"). The ALJ detailed Plaintiff's arthritis conditions, all the symptoms that involved Plaintiff's joints, mobility, and dexterity. (Tr. 11-21). The ALJ noted records where there was a diagnosis of "possible" rheumatoid arthritis and a recommendation that Plaintiff follow up with a rheumatologist. (Tr. 15). The ALJ also noted medical opinions regarding to what degree Plaintiff's impairments limited his ability to sit, stand, walk, and other job-related functions. (Tr. 18). The ALJ gave great weight to Dr. Smith's opinion that Plaintiff was capable of light exertion with postural and environmental limitations and found that the opinion was consistent with the objective findings of consultative examiner Dr. Szollas. (Tr. 18).

Moreover, Plaintiff did not allege in his application or testify at hearing that he was disabled specifically by rheumatoid arthritis. Plaintiff failed to meet his burden to demonstrate that the rheumatoid arthritis resulted in additional limitations that were not already contemplated by the ALJ's account for only arthritis. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993); *see also Kitts v. Apfel*, 204 F.3d 785, 786 (8th Cir.2000) (finding that where the plaintiff failed to allege a mental impairment in her application or at the hearing, and the record showed only a diagnosis and medication the ALJ was not on notice); *Wrights v. Colvin*, No. 3:13-CV-02516-GBC, 2015 WL 2344948, at *7 (M.D. Pa. May 14, 2015) (finding no reversible error where the plaintiff failed to allege "trigger finger" as an impairment).

The Court finds no reversible error in the ALJ not specifically including rheumatoid arthritis as an impairment.

## F. Weight Accorded to Medical Opinions

Plaintiff argues that the ALJ erred in granting greater weight to the non-examining consultative opinions of Dr. Smith than to the examining consultative opinions of Drs. McLaughlin and Szollas.  Pl. Brief at 20-28.  Plaintiff argues that "[w]hen the only medical opinions of record which support the ALJ's RFC finding

are those of the non-examining state agency physician . . . the ALJ's decision is not supported by substantial evidence." Pl. Brief at 24.[6]

Generally, there is a hierarchy of weight allotted between three types of physician opinions: opinions of those who treat the claimant (treating physicians) are given more weight than opinions by those who examine but do not treat the claimant (examining physicians), and the opinions of examining physicians are given greater weight than the opinions of those who neither examine nor treat the claimant (non-examining physicians). *See* 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). However, this hierarchy is not absolute. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see e.g.*, *Johnson v. Barnhart*, 89 F. App'x 364, 368 (3d Cir. 2004) (affirming rejection of examining physician opinion in favor of opinion of non-examining physician); *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (noting criteria necessary to reject a treating physician's opinion); *Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003) (affirming rejection of treating physician opinion which adopted subjective reports of claimant).[7]

---

[6] Plaintiff further argues that it is impermissible for Dr. Smith to rely on the clinical observations of Drs. McLaughlin and Szollas in order to arrive at a different conclusion regarding Plaintiff's capabilities and it is equally impermissible for the ALJ to conclude that the observations from Dr. Szollas' examination support Dr. Smith's opinion. Pl. Brief at 21-23. Plaintiff's argument lacks merit. The purpose of non-examining physicians is to review other doctors' opinions and non-examining physicians have the expertise to reach a different conclusion.

[7] In delineating criteria for rejecting an examining opinion, the court in *Johnson v. Barnhart* cited to *Morales v. Apfel*, 225 F.3d 310, 317, which discussed the criteria for rejecting a treating physician opinion. *See Johnson v. Barnhart*, 89 F. App'x 364, 368 (3d Cir. 2004). If a type of evidence can defeat the stronger opinion in the hierarchy, then the same type of evidence can defeat a weaker opinion. *See Johnson v. Barnhart*. Thus, in cases where particular evidence was

For weighing all medical opinions, the Commissioner considers the factors enumerated in 20 C.F.R. §§ 404.1527(c), 416.927(c).  Pursuant to subsection (c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion."  Pursuant to subsection (c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  Pursuant to subsection (c)(5), more weight may be assigned to specialists, and subsection (c)(6) allows consideration of other factors which "tend to support or contradict the opinion."  20 C.F.R. §§ 404.1527(c), 416.927(c).

When a physician's opinion is based on subjective, rather than objective, information, and the ALJ has properly found a claimant's subjective claims to be less than fully credible, an ALJ may assign less weight to the opinion:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) ("The ALJ thus disregarded Dr. Bliss' opinion because it was premised on Fair's own subjective complaints, which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician.").

sufficient to reject a treating source opinion is cited as support that the same form of evidence should be sufficient to reject an examining opinion.

*Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003) (some internal citations omitted).  If a non-examining opinion is better supported, more consistent with evidence, or authored by a specialist, then it may be entitled to greater weight than examining or treating opinions.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (Non-examining consultants are "highly qualified…medical specialists who are also experts in Social Security disability evaluation."); *Johnson v. Barnhart*, 89 F. App'x 364, 368 (3d Cir. 2004). An ALJ may reject an examining physician's opinion in favor of a non-examining physician opinion on the basis of contradictory evidence.   *See* 20 C.F.R. 404.1527(c); *Johnson v. Barnhart*, 89 F. App'x 364, 368 (3d Cir. 2004); Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936 (ALJ may rely on non-medical evidence which is inconsistent with treating physician's opinion); *Torres v. Barnhart*, 139 F. App'x 411, 414 (3d Cir. 2005) (ALJ permissibly rejected treating opinion "in combination with other evidence of record including Claimant's own testimony"); *Kays v. Colvin*, No. 1:13-CV-02468, 2014 WL 7012758, at *7 (M.D. Pa. Dec. 11, 2014).

An ALJ is entitled generally to credit parts of an opinion without crediting the entire opinion.  *See Thackara v. Colvin*, No. 1:14-CV-00158-GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); *Turner v. Colvin*, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting

some parts of a treating source's opinion and rejecting other portions"); *Connors v. Astrue*, No. 10-CV-197-PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011).

Contrary to Plaintiff's assertion, substantial evidence can support an ALJ's RFC finding where an ALJ chooses an opinion of a non-examining state agency physician over an opinion of an examining state agency physician.  As discussed above, substantial evidence supports the ALJ's credibility finding and assessment of Plaintiff's cane use and ability to climb stairs.  The ALJ highlighted Plaintiff's recorded ability to climb stairs and mobility without a cane in support of allotting less weight to Dr. McLaughlin's opinion that Plaintiff could "never" climb stairs and observation that Plaintiff "cannot go without a cane."  *See* (Tr. 17, 20).  Based upon these contradictions, substantial evidence supports the ALJ affording less weight to Dr. McLaughlin's opinion.  Additionally, substantial evidence supports the ALJ's granting greater weight to Dr. Smith's opinion given that Dr. Smith had the opportunity to review the opinion of Dr. Szollas and review other records that were not reviewed by Dr. McLaughlin.  Dr. Smith was able to view the longitudinal picture of Plaintiff's impairments throughout many medical records.

While Dr. Szollas opined that Plaintiff had memory loss (Tr. 409), the ALJ noted that "[Plaintiff] was able to follow instructions and he had a good knowledge of his recent and remote medical history. This contradicts the claimant's testimony

of difficulty with memory." (Tr. 18). With regard to Dr. Szollas' opinion the ALJ stated:

> Dr. Szollas notes the claimant's subjective complaints that the claimant reports dyspnea for shortness of breath on exertion after walking 200 feet Dr. Szollas opined the claimant can sit 6 hours, stand 1-2 hours at one time and up to 2 hours in an 8-hour workday and walk 20 minutes at a time and 10-20 minutes total in an 8-hour workday (Exhibit 12F/l6). These opinions are inconsistent with Dr. Szollas findings upon physical examination of the claimant. For instance, Dr. Szollas reported the claimant presented without ambulatory aids and ambulated into the examination room with a normal gait. He was able to stand unassisted, rise from a seated position, and step up and down from the examination table without difficulty.

(Tr. 20). Essentially, the ALJ found that, to the extent that Dr. Szollas' opinion depends upon Plaintiff's subjective complaints, the ALJ would give less weight since the ALJ already found that Plaintiff's report of subjective symptoms was less than credible. While it is true that Plaintiff's ability to ambulate into the examination room with a normal gait has little bearing on Plaintiff's ability to climb stairs or walk long distances without experiencing shortness of breath, such reasoning is harmless error. *See e.g.*, *Williams v. Barnhart*, 87 F. App'x 240, 243-44 (3d Cir. 2004). Dr. Szollas did not perform any objective exertional tests to support her conclusions regarding how long Plaintiff could walk, leaving simply Plaintiff's subjective reports. In such a situation, the ALJ has the discretion to reconcile the contradictory opinions and choose to give more weight Dr. Smith's

opinion over Dr. Szollas' opinion.  Substantial evidence supports the weight ALJ

gave to the different doctor opinions.[8]

## V. Recommendation

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by

substantial evidence; and

II.      The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings,
recommendations or report addressing a motion or matter described in 28
U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a
prisoner case or a habeas corpus petition within fourteen (14) days after
being served with a copy thereof. Such party shall file with the clerk of
court, and serve on the Magistrate Judge and all parties, written objections
which shall specifically identify the portions of the proposed findings,
recommendations or report to which objection is made and the basis for such
objections. The briefing requirements set forth in Local Rule 72.2 shall
apply. A Judge shall make a de novo determination of those portions of the
report or specified proposed findings or recommendations to which
objection is made and may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge. The Judge,
however, need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the
magistrate judge, making his or her own determination on the basis of that
record. The Judge may also receive further evidence, recall witnesses or
recommit the matter to the Magistrate Judge with instructions.

---

[8] Plaintiff further argues that it was error for the ALJ not to conclude that since Drs. Szollas' and
McLaughlin's opinions were both consistent with each other that Plaintiff would be limited to
sedentary work, such entails that the ALJ should give them both elevated weight.  (Tr. 23).
Given the above analysis and finding that substantial evidence supports the ALJ's allocation of
greater weight to Dr. Smith, this argument fails.

Dated: February 23, 2016            s/Gerald B. Cohn
                                **GERALD B. COHN**
                  **UNITED STATES MAGISTRATE JUDGE**